Good morning. I'm Jay Lichtman. I represent Mr. Brown. We would like three minutes of rebuttal. We being the defense side would like that. I'm going to first start off with addressing the sentencing issue regarding Mr. Brown. Touch on the jury issue in terms of excusing a juror for cause. And this we fall will then pick up on the juror misconduct issue. And Mr. Brennan, I believe, will discuss insufficiency of evidence as to his client. So beginning on the with the sentencing issue, the court to impose a mandatory minimum sentence on Mr. Brown. The court used an incorrect legal standard. The court was under the erroneous impression that it was bound to impose a mandatory minimum sentence without assessing Mr. Brown's individual culpability or the foreseeability element in this conspiracy charge. It felt it was required because the jury found that the conspiracy quote involved one thousand or more kilos of marijuana. The court some specific more than that, didn't they? And didn't they find specifically that he agreed to distribute a thousand kilograms of marijuana? That was a special verdict of the jury, which essentially tracked the indictment in the case. But the court never really got to the special verdict issue because the court was under the impression that it was bound to impose a mandatory minimum sentence without assessing Mr. Brown's individual culpability. That was a wrong legal standard. The court never used the special verdict to make that assessment because it believed that it didn't have to. What significance do we attach to the fact that the jury specifically specially found that Brown conspired and agreed to distribute a thousand kilograms more marijuana and did this in response to a jury instruction which called upon them to determine his personal foreseeable complicity? First of all, regardless of what a jury may find, a court is bound to make an independent assessment of an individual's culpability in a conspiracy case. The Supreme Court in Edwards mentioned that despite what the jury may believe, the court must make this assessment under the guidelines. And the court cited Watts. Watts is a case where the Supreme Court said that the judge can base a sentencing on acquitted conduct. In effect, disregarding a jury's verdict of acquittal and use that conduct to impose a sentence. We also cited... That has a different standard. The judge only had to find by a preponderance of the evidence where the jury has to find beyond a reasonable doubt. I understand that, but... I'm painfully familiar with that case. Yes, Your Honor. I use that as a citation in Edwards for the idea that a court is not necessarily bound by what a jury decides. The court in a sentencing proceeding is to make an independent assessment. If you look at the First Circuit case, we cited Picanzo. Picanzo was a drug conspiracy case where there was a special verdict where they found the defendant was involved in 500 grams to 5 kilos of drugs. And the district court found it would be legal error to... The Court of Appeals found it would be legal error for the district court to feel and determine it was somehow bound by that special verdict. This is kind of Alice in Wonderland to me. When the jury has found beyond a reasonable doubt and the standard for the judge is probable cause, it seems to me that you're not going to overlook the jury's finding beyond a reasonable doubt. Well, you can. You certainly... You're not bound by accepting a jury's finding, especially when it just simply tracked the language in the indictment. Are you suggesting that there wasn't evidence to support that finding? Oh, I'm indeed suggesting that. As to Mr. Brown, he was essentially a mere runner. His involvement in this, according to the evidence, was that he rented vehicles for Mr. Morant in Miami and Los Angeles, and he delivered some address labels called powership labels, address labels on one occasion from New York to Los Angeles. That essentially was his activity in this case. The evidence was very minimal as to his involvement. I say he rented vehicles. He rented a U-Haul truck on two occasions in Los Angeles. There was surveillance done of the truck by the police. They trailed the truck. They did not see it involved in marijuana or carrying marijuana. And, in fact, they found that when they trailed it and was under surveillance for a few days, March 16th through March 18th, that the truck was used to bring household goods to a storage facility. Then the truck was rented again on April 7th. The police surveyed the truck from April 7th to April 10th. They then, and there was no activity that the truck was involved in with marijuana, no evidence. And they searched the truck on that occasion, and they found the truck to be empty. So it's very questionable whether the truck was ever used to move marijuana. I'm wondering about the import of this. You're not challenging the sufficiency of the evidence, are you? No. What I'm saying is that had the judge used the correct standard and assessed Mr. Brown's individual culpability as he was required to do, he may very well and should have found his guideline calculation to be well below what it was found to be, and that the mandatory minimum should not apply to Mr. Brown. Because if you assess the individual culpability as he should have, Mr. Brown should not have qualified for a mandatory minimum ten years. I understand. The jury found enough for the mandatory minimum, and the court also, in discussing it, determined there was more than enough for the mandatory minimum. I have a hard time following what you're trying to get across here. The judge never assessed Mr. Brown's individual culpability. Well, he assessed the culpability. He talked about how many boxes Mr. Brown had and the others, didn't he? No, Mr. Brown never had any boxes. He wasn't a FedEx driver. He simply was a runner. You might be considering Mr. Kizzy's sentencing. But Mr. Brown, the judge never considered the evidence of Mr. Brown's individual culpability because he determined he didn't have to. He said that because it is required by law, because the jury has found beyond a reasonable doubt that the defendant, Mr. Brown, was a member of a conspiracy to distribute marijuana that involved the distribution in excess of 1,000 kilos of marijuana, the mandatory minimum sentence is required. That was clearly an error of law. That is not the case. In fact, the government acknowledges it is not the case. On page 73 of its brief, when they interpret this court's recent opinion in Houston, where the government says a sentencing court must determine that a drug quantity was foreseeable before imposing a mandatory minimum sentence, when, as in this case, the defendant has been convicted of only a drug conspiracy. Was there a special verdict in that case? In Houston? I don't recall. Isn't that the key here? I mean, the judge instructed the jury that the jury had to find what that particular defendant reasonably foresaw. And this particular jury found what your guy particularly foresaw. But that doesn't require the judge to accept the jury's finding. But the judge found that the finding was valid. No, he didn't, Your Honor.  No, the judge never made an assessment of the evidence because the judge was of the opinion he didn't have to. All he believed was once the jury found that the conspiracy, quote, involved 1,000 or more kilograms, it didn't matter what Mr. Brown's culpability was or his foreseeability. As long as the jury found that the conspiracy at large involved that amount of drugs, the judge determined that that's all he needed for a mandatory minimum sentence. And that was clearly an incorrect application of the law. So he never got to the point of assessing Mr. Brown's culpability. And, in fact, had he, based on this fairly minimal amount of evidence, I don't think there's any way that the judge could find that this amount of drugs was foreseeable in Mr. Brown. Simply taking address labels from New York to L.A. and simply renting some U-Haul trucks, when the surveillance of the agent, Agent Schiller, testified that from March 1st to April 13th, the warehouse was under surveillance. They never saw Mr. Brown at the warehouse. They never saw Mr. Brown near the U-Haul truck. Selborne Benton, a government witness who ran the warehouse, testified. He looked around the courtroom and he was asked, does he recognize anyone? He looked at Mr. Brown, said, don't recognize anyone here that worked in that warehouse. Clearly, Mr. Brown didn't work in the warehouse. His involvement was minimal. So, therefore, had the judge done what he should have done and assessed the culpability, I believe that the sentence would be below the mandatory minimum because it did not, Mr. Brown's activity would not qualify him for 1,000 kilos. I don't want to derail you, but I want to make sure your friends get a chance to say something. I'll just briefly discuss the other issue. I know time is limited. This issue has to do with the excusal of Prospective Juror Carter. The Court is aware of the Wainwright standard, whether his belief was substantially impairs performance of his duties in accordance with instructions and his oath. And Mr. Carter was asked specifically whether if he was instructed to follow, to base his decision on the evidence and the court's instructions, whether he could do that. What's the prejudice if he was struck by a mistake? What's the prejudice? Well, tried by 12 people who were also not prejudiced. Well, because if the juror was excused for cause improperly and there's presumptive bias on the jury, then it's reversible error to strike that juror. Well, that juror continued to say that he was pretty emotional. I, as a judge, would think, well, maybe he's not going to be able to dispassionately decide this case. He did say he wears his emotions on his sleeve, I think was the way he put it. He did say he might have some difficulty in being impartial. However, the fact that he's willing to base his decision on the evidence and the jury instructions should have caused the judge to keep him on the panel. And we have cases where. It's our standard, isn't it? Abuse of discretion. It is abuse of discretion. But you have other cases where jurors say they hope or they think they could be impartial or they believe they might favor the government or one case where the juror actually read about the crime in the newspaper and the court said, well, that's not enough to excuse a juror. The fact that a juror can follow the law is sufficient to keep that juror on the jury. And I think the judge did abuse his discretion in excusing Juror Carter. I think it's reversible because of this presumptive jury bias. And with that, I'll have Ms. Wiefel discuss the jury bias. Thank you. Thank you. Good morning, Ms. Wiefel. Good morning. Vernal, we thought on behalf of Jason Kizzee. Who are you? Kizzee? Kizzee. Okay. The issue that I will discuss is whether or not this court should remand the case to the district court for an evidentiary hearing on the jury misconduct issue. The district court was alerted by a letter from Juror Chandler regarding conversations in the jury room and also by Mr. McKesson, who represented Mr. Kizzee, his conversation with Juror Holmes, who said to her in tears or near tears after the verdict that there was a lot of bias going on in the jury room. Well, that's what McKesson says she said. That is correct. Not what she says she said. What she said was, and I think this is important, she did say, it started out because I think the district court misapplied the standard and misunderstood that the issue was not racial bias, but bias in the courtroom. And so right off the bat, after receiving Juror Chandler's letter and Mr. McKesson's declaration, the court said it was going to hold a hearing, but it forbid the defense attorneys and the government right off the bat from conducting any investigation, from interviewing any jurors, and essentially brought three jurors into the courtroom, the Foreman, Juror Ack, Juror Chandler, and Juror Holmes, all of whom had not been apprised by the parties of why they were being brought in there. You know, Counsel, something that troubles me about this, we're not supposed to intrude into the deliberations that took place in the jury room. And it seems to me we're dangerous to be close. Well, that's correct. But the issue of whether a juror is biased, because the defendants are entitled to jurors who are impartial and indifferent. And Juror Holmes, when she was asked by the judge if there was racial bias and she said no, there were things that were said, she admitted that she was near tears, and she said that the other jurors said, you know, guys, they're guilty. Now, if we also look at the fact that in Juror Chandler's letter, he was concerned that he said there was bias right from the beginning in the deliberations. But the issue is, were some of these jurors biased before they even went into the jury deliberation room? Was there a prejudgment of the case? And if there was, then the defendants are entitled to a new trial. And the inquiry into whether or not jurors were biased because they prejudged the case or for any other reason does not impact on the deliberations and that sort of thing like that. Is it prejudgment when you have sat and listened to the evidence and you've come to an independent conclusion? Well, that evidence is such, I know they're guilty. You go into the jury room, say that. Is that the impermissible? Certainly the goal in the deliberation room is for one side to win and one side to lose. The jurors are supposed to determine whether or not, based upon the evidence that was presented to them during deliberations, do they find guilty on a reasonable doubt. But I submit that what is not clear is whether that is what happened here and whether or not the jurors, you know, the statement, you know they're guilty, and in Juror Chandler's concern was that the jurors said, you know, we knew they were guilty when we walked in here and now let's just get this over with. That would be prejudgment of the case prior to getting into the deliberation room. And without an adequate inquiry, we don't know. She never said that's what they said. Pardon me? She never said that's what they said. She did say, you know they're guilty. She did say that. The issue is when did they decide they were guilty, after they went into the deliberation room, or was this a concern about prejudgment of the case before the deliberations? And because the hearing was truncated and no investigation was permitted, we're not really sure what happened. And there wasn't any rule that prohibited the defense attorneys from contacting the jurors. In fact, it would have been a much better hearing, not only for the district court to make its ruling, but for this court to rule on what happened had the parties been able to conduct investigations, submit affidavits, and have the hearing have a broader scope. Thank you. If there are no other questions, I'll turn it over to Mr. Brennan. Thank you. Mr. Brennan, hello again. Hello. Michael Brennan on behalf of Reginald Butler. The only issue that I will address is the government's failure to present sufficient evidence to support the conviction against Mr. Butler. In this case, we have a situation with a fairly organized marijuana distribution conspiracy. Mr. Batten testified that he was in charge of the warehouse where the marijuana was packaged. He was in charge of paying the FedEx drivers who were complicit in the scheme. We had the testimony of three drivers who all testified about the scheme and how it worked and their involvement and how much they got paid. The government would have the court believe that in addition to that, we had very extensive drug ledgers. There was testimony that every dollar that was spent by the organization was cataloged in the drug ledgers. The defendants' names, the drivers' names were there in the ledgers. We had surveillance. We had wiretaps. None of this elaborate evidence that was presented with respect to the defendants who went to trial implicated Mr. Butler. I guess what our question is whether any reasonable juror could have found him guilty beyond a reasonable doubt. There were the 50 phone calls, and I'm interested in, there was some testimony or some allegations that they tracked his routes and that he probably during this period was picking up and delivering marijuana packages. Now, what evidence is there of that or not? The only evidence is that there were 50 calls that were attempted. I'll go to your second point because I don't think the calls really say anything one way or the other because there's nothing about the content of the calls. But with respect to the evidence of what Mr. Butler picked up in his routes, the only evidence is that one box was seized from his truck that contained 50 pounds of marijuana. The government then presented evidence that supposedly 488 boxes that were tracked to his routes and his truck matched a profile of boxes that were involved in the conspiracy. But there's no evidence that any of these boxes actually contained marijuana. And matched a profile is a term that the government uses throughout the course of the trial, and there's no real evidence of what that means. Yes, there were boxes that Mr. Butler picked up that went to addresses that were similar to or in some instances probably the same as other addresses that Morant used. Did you try this case? I did not try it, no. What I'm interested in on this case as far as Butler is concerned because the jury made a finding of, I don't know, a thousand kilos of marijuana. He was convicted of a conspiracy count. He was just charged in count one, which was a conspiracy count. And he was found guilty of being a member of the conspiracy. Beyond that, there were no special verdicts that said anything about his direct involvement. Did the indictment say the conspiracy involved so many kilos? I forget the exact amount, but it was enough to trigger a mandatory minimum, yes. All right, and do you know whether there's any special instruction to the jury with regard to the amounts as to each defendant or was it left to the jury just to find him guilty or not guilty on each of the charges? All I can say is with respect to Mr. Butler, there was no special verdict found that talked about his personal involvement. The evidence in effect, as I see it, you're saying, as a matter of law, he might have been involved in the conspiracy, assuming that he was. But as a matter of law, the most that he would be culpable for would be the 50. No, I'm sorry. There was one box containing 50 pounds of marijuana, but I'm not. That would not trigger the mandatory minimum. Oh, no, and I'm suggesting to the court that there's no evidence that Mr. Butler had any knowledge of the contents of that particular box. There's nothing that connects him to the conspiracy directly. There's some inferences that the government argues the jury could use to draw. Two things. Didn't he have a suspicion that the box might contain contraband? He got to a point where he had developed a suspicion about Morant and he refused to pick up in November of 1999 that Morant wanted him to pick up. And he went to some length to refuse that pickup. He told Morant he was going to pick up. That didn't involve the box? No. The box that was seized was seized in September of that same year. In November, Morant goes through an elaborate process of trying to get Butler to pick up some boxes. Butler meets him at a particular location. He tells Morant that he's going to pick up these boxes and then he leaves them. To answer your question, he was sentenced under the safety valve. Isn't that right? That's correct. And it's going to have to go back because, or does it have to go back on Ammaline? No. Not as far as Butler is concerned. Because the sentence did not depend upon any fact-finding by the court. So this is not an Ammaline case. Unless we find some error. If you agree that there was insufficient evidence, then the conviction should be set aside. I would also find there was insufficient evidence for the amount that was charged against him. So, therefore, the safety valve should not have been involved at all. And then it would be up to the court to decide what the sentence is. Isn't that right? That's possible. The only issue I've raised directly on behalf of Mr. Butler is the insufficiency issue. You can have an Ammaline remand not because there was judicial fact-finding, but just because you aren't sure what the district court would have found. I agree, Your Honor, and I'm not waiving that issue. I've joined in the other issues raised by the co-defendants in the case. But with respect to my argument to you this morning, I'm raising the issue of the insufficiency. Let me follow up on that for a second. If we were to affirm the conviction, would you want it remanded for resentencing, or are you happy with what you have? Your Honor, I don't believe the court could impose a sentence that would be more beneficial to Mr. Butler under the circumstances of this case. So I would not be urging the court to do that. His sentence was approximately seven years, and quite frankly, he has served almost all of it and is due to be released shortly. So I think if the court were to reverse and set aside his conviction, I doubt seriously that the government would retry him. He has, in fact, served the custodial sentence, and so the only ultimate effect would be that he would be not left with a felony conviction. Let me ask you a question about the sufficiency of the evidence. This is what's kind of concerned me about your claim. I agree the evidence is less than with the others, but anybody who's familiar with FedEx, anybody who's familiar with UPS or even the post office knows you don't go meet the mailman at a McDonald's to pick up your shipment or to drop a shipment off or to have the personal cell phone number of the courier. Your guy has a series of these, you know, a lot of these out-of-the-ordinary mainstream kind of phone calls to this. Actually, the evidence in the record in this case is that FedEx drivers do regularly meet customers and make pickups at their locations. It's not like the post office. Your locations being what? Their businesses. They go to their businesses. FedEx drivers make money on their ability to generate customers on their own, so they have an interest in generating new customers, you know, accommodating new customers, going and picking up packages from them where they might be as opposed to, you know, the post office with a, you know, here's the mailbox or here's the post office itself. FedEx drivers don't operate that way. They're... You don't have an 800 number where you call if you want to pick up your... Oh, absolutely. Instead of calling 1-800-FEDEX, they call your cell phone. Morant had Butler's cell phone number, and there were calls that were both placed and attempted to be placed. There's no question about that. That's a little unusual, isn't it? No, I don't believe so, because FedEx drivers are at some level independent contractors in that they can increase their earnings as drivers by developing more business. And so if I have somebody who's going to, you know, give a lot of business to me, it makes sense for me to be able to get in touch with him. And that's his story. But it has nothing to do... It certainly doesn't get to the point of demonstrating that he had knowledge of what Morant was doing with these boxes that he wanted to ship. In fact, Butler testified that if he was a knowing participant, what he would have done was to take somebody else's scanner There's evidence in the record that other people were using other drivers' scanners to avoid detection. There was ways to make pickups that went into the FedEx system without using a scanner at all. There were a number of ways that Butler could have made these pickups without having that information traced back to him in any way whatsoever. So if you're a knowing participant, why would you do it in such a way that it's so easy to trace it right back to you? Here's 488 boxes which supposedly meet the profile and they're traced back to him. If he's doing this knowingly, he's going to do it in such a way that he doesn't get this information traced directly back to him that easily. Because there's so many ways to avoid it. And that's what he testified to at trial. Thank you. Good morning. Good morning. May it please the court. My name is Gonzalo Curiel. I represent the appellee, United States. And there were a number of issues raised in this case. And what I would like to do is limit myself to those issues that were argued today. Why don't you start with Mr. Butler? And I was going to propose that, Your Honor. Keeping in mind that what we're talking about is a massive conspiracy. Speak a little bit louder. Yes, Your Honor. This case involved a massive conspiracy involving the transportation of hundreds of tons of marijuana from Southern California to the East Coast. And Mark Morant was savvy enough where he was able to employ a novel method in getting his marijuana from Southern California to the East Coast. He used the FedEx system, a system that's relied upon by businesses throughout the world. And he was able to rely upon FedEx because he was able to corrupt any number of FedEx employees. Now, didn't he pay to the FedEx employees, didn't he pay all of them $2,000? And the only ones who were paid $150 is, I gather, one was Butler and I guess the other was Brown. Well, the first part of your question, Your Honor, is whether or not the couriers were provided $1,000 or $2,000 a week. The evidence, I believe, does show that. Now, with respect to Mr. Butler's self-serving statements that he only made $150, I think that is not supported by the record. Ultimately, the government submitted at trial Exhibit 11, which was made up of drug ledgers that were prepared by Arlene Pasley, who went by the name of Pauline Pickersgill. And in the ledger, there are references to payments made to different participants in the conspiracy, including the crew and Reggie. Never to Butler. Actually, Your Honor, there are a couple. There's three, in fact. And the most notable one is one to Reggie that took place on September 11th, which was the day after the September 10, 1999 seizure of drugs. And Your Honor, I apologize that we didn't provide it to this court in our briefs. I did not try the case below. And as the court knows, it's a very voluminous record. But since the time that we filed a brief, I have noted in the closing argument by now Magistrate Judge Walsh, the prosecutor made reference to the argument that there were no references to Reginald Butler in the P&O sheet. And Prosecutor Walsh said, yes, in Exhibit 11, the P&O sheets, there are three separate notes for Reggie. Big Reg or Reggie. And if the court would like, I can have copies of those sheets provided. At this point, the state of the record that we submitted, the excerpts, it is not. Is this a 70 or a base number, stamp 38? Your Honor, well, actually, I believe it's attached to, I believe, the government's sentencing memorandum for Reginald Butler. If one focuses on that, because we had actually submitted an additional portion of the drug ledgers, and that did not refer to Reggie. But if the court would like, I can. I'm just trying to follow. This is, I got the ledger. I see September 11. I see Reggie on here. Is this before the jury or was this for the. That was before the jury, Your Honor. And that was cited by the prosecution in closing. That Reggie was tied to Butler for the jury? Well, we believe so. Butler's first name is Reginald. And so to the extent that you have the name Reggie being noted, being paid, the day after the seizure of a box that had been picked up by Reginald Butler, we believe that a reasonable jury conferred that this entry corresponded to Butler's involvement in the conspiracy. But there was more than just these paying O'sheets. There were, as the court has pointed out, any number of admissions by the defendant or the appellant, Reginald Butler, which interestingly enough, he admitted at the time of his arrest that he had made, he had picked up a number of boxes for Morant. But realizing how that implicated him and how that placed him in the midst of this conspiracy, by the time that Mr. Butler testified at trial, suddenly he denied that he had picked up boxes for Morant. Notwithstanding the fact that you have 50 contacts between Mark Morant and Reginald Butler during the time frame that the FedEx records demonstrated that he would have picked up 488 boxes that were sent to fictitious addresses in the East Coast that all fit within the modus operandi that was used by Morant. And keeping in mind that Morant didn't need to go to unwitting couriers to pick up his boxes to transport them to the East Coast. He had any number of them already working for him. And how do we know that? We know that from at least two of the couriers who testified, Christopher Lee from New York, Walter Shaw, a FedEx driver here in Los Angeles, and then we had Betton testify about other FedEx drivers. So we know that there were at least four, five, six FedEx couriers who were willing to be corrupted, willing to pick up marijuana boxes in order for them to be shipped. How come nobody seemed to know Butler or to name Butler? Nobody did, is that correct? Well, someone did. Mark Morant, for example. But Mark Morant didn't testify at trial. Instead, we had Selbram Betton. And Selbram Betton didn't know every FedEx courier because there were any number. Well, there's a very simple answer to my question. Nobody mentioned or identified Butler. Is that right? With respect to Benton, no. As to Shaw, no. As far as the circumstances, as far as the business records, as far as the old sheets, yes. I'm just asking. This was rather odd that there was no identification. Your Honor, it would appear that it was a product of the fact that Mark Morant himself was the individual that contacted Reginald Butler. He's the one that himself corrupted, unlike in the case of Kizzee, who was corrupted by Shaw, who was contacted by another individual. And keep in mind that Kizzee had no direct involvement with Morant. So for whatever reasons, there were, in some cases, direct connections between co-conspirators. In other cases, there weren't. Well, your position is since all we know is he got $150 in one payment and he went living in a high lifestyle, it has to be that Morant was able to corrupt Butler with $150. And as to others, they're being paid off in some way for $2,000 a week. Well, the position of the government was that Reginald Butler, like his brethren, like the other corrupt FedEx couriers, was being paid $2,000. And we relied upon the drug ledgers that would have reflected that. And I believe the jury was in favor. It wasn't on appeal. You didn't put it into your brief. That's correct, Your Honor. I don't understand. Did the drug records indicate that Reggie Butler was getting $2,000 a week? That was the government's argument, Your Honor. I don't want an argument. I want whether the records showed that. We believe that they do. And I believe, as Judge Silverman pointed out, there is an entry on September 11th. Yes. For $2,000 or $150? Two. Two? $2,000. Keep in mind, it doesn't say $2,000. It looks like 2.5. I don't know what that is. Okay. And so our argument would have been $2,500 versus $150. And there would have been testimony at trial with respect to what the notations meant. Because the drug ledgers never said specifically $1,000, $2,000. They would note it as a two. They would note it as a .2. And so in the case of Reginald Butler, the evidence was there for the jury to draw the inferences that his self-serving statement that he received $150 was false. In addition, the jury could conclude that Reginald Butler's self-serving statements at trial, that he had never picked up boxes from Morant, was also false, and that that was consciousness of guilt, that he was aware of what he had done for 488 boxes. Your Honor, if I may then move on to some of the other arguments that were raised. If I can address the argument by Mr. Lichtman with respect to the mandatory minimum determination made in this case, I would concur with a number of the observations made by the judge with respect to the effect to be given the jury's verdict, the jury's special verdict, as to the defendants. And note that in this case, for the jury to conclude that the defendants were involved in at least 1,000 kilograms of marijuana. That was in the special verdict for each defendant? Well, each defendant had to be found guilty, one, of conspiracy to distribute or possessed to distribute marijuana. That was the first point. Second of all, then the jury had to determine whether or not it was marijuana. And then the third point was to determine a quantity. And with respect to the quantity, the judge had instructed the jury that the amount of marijuana involved in the particular defendant's commission of the offense is the total amount such defendant was directly involved in distributing, plus the amount he or she agreed, understood, or reasonably could have foreseen would be distributed in furtherance of the conspiracy. So combining that instruction with their findings, then the jury necessarily found beyond a reasonable doubt that the defendants were accountable, were criminally responsible under the standards that this court has declared under the guidelines and under the statute. So as a result, the notion that Judge King didn't have sufficient evidence or didn't make the requisite findings has to fail. We pointed out a number of cases within our brief which support the government's position. And the most important, I believe, would be the baquette from the Seventh Circuit with respect to what weight can be given to special findings by a jury. But in addition, we have just submitted additional authorities with respect to this issue. And one case in particular, United States v. Compost, 362 F. 3rd, 1013, which essentially finds that when a jury makes a determination on a quantity, it would be error for a judge to disregard that. That's an Eighth Circuit case. It is, Your Honor. And so ultimately, here, you had the jury find only based upon admissible evidence that each of the defendants was criminally responsible based upon the instruction that it had given for more than 1,000 kilograms. As such, if Judge King had turned around and said, you know what, I know that's what the jury found beyond a reasonable doubt, but I disagree. We submit that that would have been error. Well, suppose, are you saying, say if Judge King said, you know, the jury found 1,000 kilograms, but I've reviewed the record, and the evidence substantiates only 100 pounds. That would be legal error, and we would have to reverse it? Your Honor, I think what happened here is that Judge King... But I'm going to what you say the law is, that the judge has no authority to reduce the amount of contraband if he makes appropriate findings that are contrary to the jury verdict. We believe that in the case of a situation where there's insufficient evidence to support a jury determination, that in that case a district court may be able to. But in this case, in fact, Judge King said that I find that the jury's... I get you. And I'm not sure if the Court has any additional questions with respect to any of the issues. If not, I would like to thank the Court for its time. Thank you. Thank you, Mr. Curiel. Okay. Back to you folks. You've got to give me two minutes in rebuttal. You actually used up the time. We'll allot you two minutes. Back to the sentencing issue. Could you pull the mic in front of you? Back to the sentencing issue. In the First Circuit case, Picanzo, there was a special verdict, and the Court of Appeals found that it would be error if the judge felt he was bound to follow that special verdict and, in fact, said the judge was obligated to determine whether the evidence supported the special verdict. And that's consistent with the Supreme Court case in Edwards, which talked about the need in a conspiracy case for the judge to make an independent assessment. Well, this is really a sufficiency of the evidence determination, is it not? Correct. In a sentencing capacity. That's a good way that I think is appropriate here. This judge, Judge King, never took the step of assessing the evidence, asked for Mr. Brown. If you look at the discussion in the sentencing hearing, he never analyzed what Mr. Brown's role was, what Mr. Brown did or what Mr. Brown didn't do, because he said, all I have to find is that if Mr. Brown was a member of a conspiracy that, quote, involved a thousand kilos of marijuana, that's all I need to know. He's committed. He qualifies for a mandatory minimum, and the judge felt he did not have to go further. That was the judge's error. He needed to go further to find Mr. Brown's individual culpability, and he never did. The argument was that he was a minor participant. In fact, that's what even the government agreed, that he was a minor participant. He was a runner that transported some address labels and rented a couple of trucks. And that's essentially what he did in this case. I think if you looked at the evidence, if Judge King had made an independent assessment, he would have not found that Mr. Brown should be on the hook for a thousand kilos of marijuana. I don't think even close to that. I think Judge King, unfortunately, labored under a wrong legal standard. Usually when in these cases we're finding that the person was a one-time courier or something like that, here, Brown knew what was going on, did he not? Well, he was convicted of conspiracy, so that's sort of a broad question. I think that Brown was just a very minor player. I mean, he was a courier that transported things and rented a couple of trucks and a car, I think, in Miami, using his own valid driver's license. And the jury was somewhat troubled because a lot of the jury notes over the course of deliberations had to do with Brown's testimony or readbacks that related to Mr. Brown. So I think that, you know, if you look into that, perhaps the jury was concerned about the de minimis evidence on Mr. Brown. And I think that had Judge King used the correct legal standard and assessed the evidence on Mr. Brown, that he should have and would have come up with a sentence that was not a mandatory minimum sentence, but was an appropriate guideline sentence, which was well below the 10 years. And I think you should remand under Emmeline, not only because Judge King made a wrong assessment as to mandatory minimum, but now if we're going to have a resentencing, it should be done under Booker-Emmeline standards where you look at 355-3A and all of the factors that need to be done as you would have a new sentence now. Who corrupted Brown? I mean, the use of the government's word is corrupted. Mr. Brown knew Morant when they grew up in Jamaica many years before and there was connection that they had years later through, I think, a mutual friend or cousin. And Morant got in touch with Mr. Brown and Mr. Brown then came out to L.A. and, you know, had some contact with Mr. Morant. Does he show up on any of the payment ledgers? Well, that's an interesting point, and it's one of the arguments we made on the inadmissibility of the ledger. There are entries for a FATA. Now, FATA is a nickname for Mr. Brown, but what's interesting is that these entries are in 1999. The government's contention is that Mr. Brown worked in the warehouse in 1999 and therefore got these payments. But the government called the cell boy in Benton who was in charge of the warehouse during 1997 to 2000. And Mr. Benton was asked, do you know any of the individuals in this room? He looked around and said no. He then was asked, do you know a FATA? Yes, I knew a FATA, but the FATA that he knew didn't match the description of Mr. Brown. It was obviously a different individual. Plus, we introduced some wiretap transcripts that showed there were two other individuals in the conspiracy that used the name FATA. Doesn't that go to the weight rather than the admissibility of all this? You made this argument. No, on the ledger you have to show that the author of the ledger was part of the same conspiracy as Mr. Brown when the entries were made. If the FATA in the ledger was not Mr. Brown, then it goes to the admissibility of the ledger, not just to the weight, because the foundation for that ledger would not be laid and the co-conspirator exception would not be complied with. It's hearsay. Thank you very much, counsel. The case just started.
judges: Bright , B. Fletcher, Silverman